UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| BRITTNEY MICHELLE WATKINS, | : | Case No. 25-10264-lgb |
| | : | |
| Debtor. | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| JONATHAN CORNELL, | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 25-01161-lgb |
| | : | |
| -against- | : | |
| | : | |
| BRITTNEY MICHELLE WATKINS, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF

# PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................... 1

II. JURISDICTIONAL STATEMENT ...................................................................... 2

III. PROCEDURAL HISTORY .................................................................................. 2

IV. STATEMENT OF FACTS ................................................................................... 4

    A. The Fraudulent Lease Application (June 2023) .................................................. 4

    B. Rental Performance and Non-Payment (2023–2025) ......................................... 6

    C. Defendant's Bankruptcy Filing and False Oaths .............................................. 7

    D. Rule 2004 Examination and Consciousness of Guilt ........................................ 9

    E. Pattern of Serial Default and Concealment ..................................................... 10

V. ARGUMENT ....................................................................................................... 12

    A. Legal Standard: Default Judgment Under Fed. R. Civ. P. 55(b)(2) ................... 12

B.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(4)(A) ..................... 13

   1.  Eviction Judgment Omission ........................................................................... 13

   2.  Financial Account Omissions .......................................................................... 14

   3.  Income Discrepancy......................................................................................... 14

   4.  Fraudulent Intent.............................................................................................. 15

C.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(2)(A) ..................... 16

D.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(5).......................... 17

E.  In the Alternative, Plaintiff's Debt Is Non-Dischargeable Under 11 U.S.C. § 523(a)(2)(A) ......................................................................................................................... 18

F.  In the Alternative, Plaintiff's Debt Is Non-Dischargeable Under 11 U.S.C. § 523(a)(2)(B) ......................................................................................................................... 20

G.  The Clerk's Entry of Default Should Not Be Vacated....................................................... 22

   1.  The Default Was Willful................................................................................... 22

   2.  Defendant Has No Meritorious Defense.......................................................... 23

   3.  Vacatur Would Materially Prejudice Plaintiff ................................................. 24

H.  Rule 55(b)(2) Notice Is Satisfied ...................................................................................... 24

VI.  DAMAGES................................................................................................................................ 25

VII.  CONCLUSION ........................................................................................................................ 26

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61 (2d Cir. 1981) ....................... 12

Bartenwerfer v. Buckley, 598 U.S. 21 (2023) ................................................... 20

Baxter v. Palmigiano, 425 U.S. 308 (1976) ...................................................... 10, 28

City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011) ........ 23

Cohen v. de la Cruz, 523 U.S. 213 (1998) ........................................................ 20, 26

Enron Oil Corp. v. Diakuhara, 10 F.3d 90 (2d Cir. 1993) ............................... 22, 23, 25

Field v. Mans, 516 U.S. 59 (1995) .................................................................... 19, 20

Finkel v. Romanowicz, 577 F.3d 79 (2d Cir. 2009) ......................................... 12

Grogan v. Garner, 498 U.S. 279 (1991) ........................................................... 12, 18, 27

In re Adler, 395 B.R. 827 (E.D.N.Y. 2008) ...................................................... 15

In re Bogdanovich, 292 F.3d 104 (2d Cir. 2002) .............................................. 21

In re Cacioli, 463 F.3d 229 (2d Cir. 2006) ....................................................... 17

In re Chalik, 748 F.2d 616 (11th Cir. 1984) ..................................................... 13

In re Kaiser, 722 F.2d 1574 (2d Cir. 1983) ...................................................... 16, 17

Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709 (2018) ..................... 19, 21

Pioneer Inv. Servs. Co. v. Brunswick Assocs., 507 U.S. 380 (1993) ............... 22

Wiley v. Mattei (In re Mattei), Adv. Pro. No. 21-07029-LGB

    (Bankr. S.D.N.Y. June 8, 2023) (Beckerman, J.) .......................................... 13, 15

## <u>STATUTES AND RULES</u>

11 U.S.C. § 523(a)(2)(A) ................................................................. 18–20

11 U.S.C. § 523(a)(2)(B) ................................................................. 20–22

11 U.S.C. § 727(a)(2)(A) ................................................................. 16–17

11 U.S.C. § 727(a)(4)(A) ................................................................. 13–16

11 U.S.C. § 727(a)(5) ..................................................................... 17–18

28 U.S.C. §§ 157, 1334 .................................................................. 2

28 U.S.C. §§ 1408, 1409 ................................................................ 2

28 U.S.C. § 1961 ........................................................................... 26

Fed. R. Bankr. P. 7004 ................................................................. 3, 22–23

Fed. R. Bankr. P. 7012 ................................................................. 3

Fed. R. Bankr. P. 7054 ................................................................. 28

Fed. R. Bankr. P. 7055 ................................................................. 12, 24

Fed. R. Civ. P. 54(d) .................................................................... 28

Fed. R. Civ. P. 55 ....................................................................... 12, 22, 24–25

N.Y. Real Prop. Law § 227-f ......................................................... 11, 12

# I. PRELIMINARY STATEMENT

This adversary proceeding arises from a sophisticated rental fraud scheme perpetrated by Defendant Brittney Michelle Watkins ("Defendant" or the "Debtor") against Plaintiff Jonathan Cornell ("Plaintiff"), a New York landlord. In June 2023, Defendant induced Plaintiff to enter into a residential lease for premises at 143 Admiral Lane, Unit 321, Bronx, New York 10473 (the "Premises") by submitting fabricated employment documents—including pay stubs and a W-2 from Robert Half International that fraudulently displayed the Employer Identification Number of St. Barnabas Hospital—and a fictitious landlord reference from a person who never existed. Defendant subsequently paid no rent from January 2024 onward, abandoned the Premises after the City Marshal obtained a warrant of eviction, and filed for Chapter 7 bankruptcy relief just before eviction could be completed—all while concealing from this Court and its Trustee the very financial accounts through which she had been conducting her financial life.

Defendant was served with the Summons and Complaint in this adversary proceeding. She did not answer. She did not move. She filed no responsive pleading of any kind within the time prescribed by the Federal Rules. The Clerk of Court entered her default on February 3, 2026 [ECF No. 5]. She subsequently filed a brief letter [ECF No. 7] asserting that her counsel—who expressly excluded litigation from his engagement—did not advise her of these proceedings. That letter contains not a single word in response to the fraud allegations at the core of this proceeding.

The record in this case is extraordinary in its clarity. Robert Half International certified in writing that it has no employment records for Defendant from January 2023 to the present. (Cornell Aff. ¶21; Ex. S.) Defendant's own sworn testimony at her Rule 2004 examination confirmed she had not worked at Robert Half since approximately 2020 or 2021—establishing by her own words that the June 2023 pay stubs she submitted to Plaintiff were fabricated. She walked out of that

court-ordered examination precisely when questioned about Robert Half, 29 minutes in, never to

return. Financial institution subpoenas revealed 416 bidirectional transactions between Defendant

and co-applicant Dominick Franklin White ("White") totaling $27,663.19—none of which she

disclosed in her bankruptcy schedules. The sum total of her false oaths, concealed accounts, and

evasive conduct compels the relief requested: denial of discharge in its entirety and/or in the

alternative, a determination that Plaintiff's debt of $81,267.79 is non-dischargeable.


## II.  JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations

as to the dischargeability of particular debts) and 28 U.S.C. § 157(b)(2)(J) (objections to

discharge). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a). Plaintiff

consents to entry of final orders and judgment by this Court.


## III.  PROCEDURAL HISTORY

Defendant Brittney Michelle Watkins filed a petition for relief under Chapter 7 of the

Bankruptcy Code in the Southern District of New York on February 11, 2025, commencing Case

No. 25-10264-lgb. Alan Nisselson was appointed Chapter 7 Trustee. This Court granted Plaintiff

relief from the automatic stay on March 13, 2025 [ECF No. 16 in the main case], allowing the

pending eviction proceedings to be completed. The City Marshal executed the warrant of eviction

on March 27, 2025, restoring Plaintiff's possession of the Premises.

During the pendency of the main case, this Court authorized Plaintiff to conduct Rule 2004

examinations of Defendant and co-applicant Dominick Franklin White [ECF No. 23]. The deadline

was subsequently extended twice—first by court order [ECF No. 29] and again by mutual stipulation [ECF No. 30]. Plaintiff served third-party subpoenas on financial institutions and employers, retaining ABC Legal as process server and Joshua B. Edwards, RDR, CRR as court reporter. Dominick White refused to appear for examination despite multiple court orders and proper service [ECF No. 42].

The Rule 2004 examination of Defendant was ultimately scheduled for September 25, 2025. At 2:03 p.m., 29 minutes into testimony and immediately upon questioning about her Robert Half employment, Defendant abruptly disconnected from the Zoom examination without explanation, invocation of privilege, or any subsequent attempt to reschedule or resume. Plaintiff immediately attempted to contact Defendant's counsel, telephoning J. Singer Law Group at 2:13 p.m. (unanswered) and paralegal Elliot Segnini at 2:14 p.m. and again at 2:30 p.m. Plaintiff and court reporter Joshua B. Edwards remained available for the remainder of the afternoon; Defendant never returned and no communication was received from Defendant or her counsel. [ECF No. 48 in the main case; Cornell Aff. ¶20; Ex. R.] As of the filing of this Motion, 153 days have passed without any explanation.

Plaintiff filed the Complaint in this adversary proceeding on December 29, 2025 [ECF No. 1]. The Summons was issued on January 2, 2026 [ECF No. 2] and served upon Defendant and her counsel of record in the main bankruptcy case, Jeb Singer, Esq. of J. Singer Law Group, pursuant to Fed. R. Bankr. P. 7004 [ECF No. 3]. Defendant's answer was due on or before February 2, 2026, pursuant to Fed. R. Bankr. P. 7012(a). No answer, motion, or other response was filed. Upon Plaintiff's application, the Clerk entered the default of Defendant Brittney Michelle Watkins on February 3, 2026 [ECF No. 5]. Defendant filed a letter with this Court on February 9, 2026 [ECF No. 7] requesting that the default be set aside. This Court entered an Order to Show Cause [ECF

No. 8] scheduling a consolidated hearing for March 12, 2026 at 10:00 AM ET. This Motion follows.

## IV.  STATEMENT OF FACTS

### A.  The Fraudulent Lease Application (June 2023)

In June 2023, Defendant and co-applicant Dominick Franklin White submitted a rental application for the Premises using a third-party screening platform. The application reflected an income-to-rent ratio of 4.6 times the monthly rent— one specific metric Plaintiff used to evaluate applicant qualification. (Cornell Aff. ¶3; Ex. A.) The application package included the following fabricated documents:

(a) Pay stubs purportedly issued by Robert Half International, dated June 9, 2023 and May 26, 2023, reflecting Defendant's year-to-date earnings of $28,400 in the ADP payroll format, with detailed tax calculations and direct deposit routing information. (Cornell Aff. ¶3; Ex. A.)

(b) A W-2 form purportedly issued by Robert Half International that fraudulently displayed Employer Identification Number 13-1740122—the actual EIN of Saint Barnabas Hospital—confirming that the document was assembled from real institutional data belonging to a different employer. (Cornell Aff. ¶3; Ex. A.)

(c) Pay stubs for Dominick White purportedly from Saint Barnabas Hospital, dated May 25, 2023 and June 8, 2023, each showing net pay of $4,357.34. These figures are conclusively refuted by three independent sources. Saint Barnabas Hospital's own payroll records show that White's actual net pay for those periods was $2,758.10 (May 25) and $1,896.14 (June 8)—not $4,357.34. (Cornell Aff. ¶4; Ex. B.) Municipal Credit Union

4

account statements obtained by subpoena independently confirm these figures: White's MCU account received direct deposits from St. Barnabas Hospital of $600.00 on May 10 and May 24, 2023, and $1,896.14 on June 7, 2023—each matching the "Dd Saving" allocations on the authentic pay stubs to the penny, and none approaching the $4,357.34 claimed on the application documents. (Cornell Aff. ¶5; Ex. C.) The application pay stubs thus inflated White's income by approximately 58% and 130%, respectively, establishing that the fabrication of application documents extended beyond Defendant's own employment records to encompass a coordinated misrepresentation of combined household income.

(d) A fabricated landlord reference from "Amanda Moss," purportedly representing 1719 Gates LLC and CW Realty Group, stating that Defendant was a tenant in good standing current on all rent obligations. Shaye Falkowitz, an authorized representative of 1719 Gates LLC and CW Realty Group, confirmed in writing on March 18, 2025 that "Amanda Moss is not and was never an agent of the LLC nor an employee of the management." (Cornell Aff. ¶¶3, 6; Exs. A, D.)

Plaintiff conducted standard landlord due diligence: he reviewed the application materials, verified the income-to-rent ratio generated by the screening platform, and telephonically contacted the person identifying herself as "Amanda Moss" at telephone number (929) 353-0387—the number listed on the rental application—on June 19, 2023. The call lasted three minutes and fifty-nine seconds, during which the person answering confirmed Defendant as a tenant in good standing current on all rent obligations. Plaintiff's Google Voice call log confirms this call. (Cornell Aff. ¶7; Ex. E.) Plaintiff had no reason to suspect any falsity and no means to detect it from a cursory review. Relying on these representations, Plaintiff executed a lease with Defendant and White on

June 23, 2023, for monthly rent of $3,300. (Cornell Aff. ¶8; Ex. F.) He would not have done so had he known of Defendant's true financial condition, or her history of prior defaults, or that the application materials were falsified.

## B.  Rental Performance and Non-Payment (2023–2025)

All rent payments received by Plaintiff from July through December 2023 originated from White's accounts—specifically, his CashApp account and Municipal Credit Union checking account—not from Defendant's accounts. (Cornell Aff. ¶¶5, 10, 11; Exs. C, H, I.) No payments of any kind were made after December 2023. Beginning in January 2024, Defendant and White ceased all rent payments while continuing to occupy the Premises.

Plaintiff commenced two proceedings in Bronx County Civil Court, Landlord and Tenant Division: a non-payment case (LT-308077-24/BX) and a holdover case (LT-324389-24/BX). Both cases were adjudicated against Defendant. Judgments of possession were entered on January 23–24, 2025—fewer than three weeks before Defendant filed her bankruptcy petition on February 11, 2025. A warrant of eviction issued January 27, 2025. Defendant filed her bankruptcy petition after losing both proceedings but before the City Marshal executed the warrant. The Marshal served notice of eviction on February 24, 2025, and executed the eviction on March 27, 2025, restoring possession to Plaintiff pursuant to this Court's Order granting relief from the automatic stay [ECF No. 16 in the main case].

Upon inspection, Plaintiff discovered intentional damage to the Premises: damaged walls and doors, and broken appliances requiring professional remediation. The total cost of property restoration was $11,946.96. (Cornell Aff. ¶¶9, 24; Ex. G.) Combined with unpaid rent, holdover

rent, and legal and eviction costs, Plaintiff's total damages are $81,267.79 as of February 20, 2026. (*Id.*)

## C. Defendant's Bankruptcy Filing and False Oaths

Defendant filed her Chapter 7 petition on February 11, 2025. Her bankruptcy schedules and Statement of Financial Affairs contained the following material false statements, each made under penalty of perjury:

1. Defendant answered "No" to Official Form 101, Part 2, Question 11—asking whether, her landlord had obtained an eviction judgment against her—despite actual knowledge of two Bronx County Civil Court judgments of possession entered just eighteen days earlier. She admitted this knowledge directly at the 341 Meeting of Creditors on March 13, 2025. (Cornell Aff. ¶12; Ex. J.)

2. Defendant answered "No" to Schedule A/B, Question 17, disclosing no financial accounts whatsoever. This answer was false as to at least six accounts: Bank of America accounts DDA 4976 and DDA 4989, Zelle (tied to her email address Brittneymwatkins004@gmail.com), CashApp ($QueenBCashy), Apple Cash, and PayPal. Each account was active at or near the petition date, as confirmed by subpoena responses from Bank of America, Early Warning Services/Zelle (Exs. I, M), Block, Inc./CashApp (Ex. H), Green Dot Bank/Apple Cash (Ex. O) and PayPal account statements (Ex. N). Defendant admitted to possessing these and other accounts when questioned at the 341 Meeting. (Ex. J.)

3. Defendant declared $7,500 in gross income for 2023 in her Statement of Financial Affairs—a figure that stands in stark contrast to the $28,400 in year-to-date Robert Half

earnings she represented to Plaintiff approximately twenty months before the petition date. When directly confronted with this discrepancy at the 341 Meeting, Defendant offered only: "I don't work there anymore" and "I don't get paid that much no more"—present-tense deflections that did not address the historical income contradiction. (Cornell Aff. ¶12; Ex. J.)

4. Defendant submitted a sworn affidavit to the Chapter 7 Trustee stating that she lacked sufficient income in 2023 to require filing a tax return. This affidavit directly contradicts the pay stubs she provided to Plaintiff showing $28,400 in Robert Half earnings and is irreconcilable with any legitimate account of her 2023 income. (Cornell Aff. ¶13; Ex. K.)

5. Defendant failed to disclose on Schedule I or otherwise her financial interdependence with White, including the fact that White paid all rent on the Premises from June 2023 through January 2024 and conducted 416 bidirectional financial transactions with Defendant totaling $27,663.19 during the period January 2023 through mid-2025. (Cornell Aff. ¶¶10, 11, 15, 16, 17, 18; Exs. H, I, M, N, O, P.)

6. The financial interdependence between Defendant and White extended to the very bankruptcy proceedings initiated to discharge Plaintiff's debt. Zelle records obtained by subpoena from Early Warning Services reveal that White made three payments totaling $1,000 directly to J. Singer Law Group, PLLC—Defendant's counsel of record in this bankruptcy case—from his Municipal Credit Union account: $400 on February 3, 2025 (memo: "For Brittney M Watkins to pay Lawyer"), $400 on March 1, 2025 (memo: "From Brittney Watkins proof of payment to Lawyer"), and $200 on April 2, 2025 (memo: "Paying to law firm"). (Cornell Aff. ¶11; Exs. I, M.) The February 3, 2025 payment—made just eight days before the petition date—demonstrates that White was actively funding

Defendant's bankruptcy legal representation at the precise moment she was preparing schedules that disclosed none of this financial relationship. Defendant's failure to disclose White's ongoing financial support on Schedule I, which requires disclosure of contributions from non-debtor household members or other persons, constitutes a further material false oath.

## D.  Rule 2004 Examination and Consciousness of Guilt

On September 25, 2025, Defendant appeared via Zoom for a court-ordered Rule 2004 examination conducted by Plaintiff with court reporter Joshua B. Edwards. (Cornell Aff. ¶19; Ex. Q.) Dominick Franklin White, despite proper service of a subpoena on September 2, 2025 pursuant to this Court's Alternative Service Order [ECF No. 42], did not appear. For the first 29 minutes, Defendant answered questions regarding her prior residences, income history, and the Queens County eviction proceeding.

Then, at 2:03 p.m., immediately when Plaintiff's questioning turned to her employment at Robert Half International—the precise employer identified on the fabricated June 2023 pay stubs—Defendant abruptly disconnected from the Zoom examination. She provided no explanation. She invoked no privilege. Plaintiff waited on the Zoom call and attempted to reach Defendant's counsel: he telephoned J. Singer Law Group at 2:13 p.m. (unanswered), reached paralegal Elliot Segnini at 2:14 p.m. (who promised to contact Defendant), and called Mr. Segnini again at 2:30 p.m. (voicemail). Plaintiff and court reporter Edwards remained on the Zoom call until 2:33 p.m. and kept their schedules available for the remainder of the afternoon. No communication was ever received from Defendant or her counsel regarding continuation. (Cornell Aff. ¶20; Ex. R; ECF No. 48 in the main case.) As of the filing of this Motion, 153 days have elapsed without any explanation for her departure.

The testimony Defendant did provide before her walkout was itself incriminating. She testified under oath that she lost her job at Robert Half International "around 2020" or "around 2021" during COVID—then, moments later in the same session, revised her answer. (Cornell Aff. ¶19; Ex. Q.) This testimony, if truthful, directly contradicts the pay stubs she submitted to Plaintiff in June 2023 purporting to reflect $28,400 in year-to-date earnings from active Robert Half employment at that time. In a separate sworn statement at the March 13, 2025 Meeting of Creditors, Defendant offered a different account, claiming she had not worked at Robert Half since 2024. (Ex. J.) The two sworn statements are irreconcilable with each other, and both are irreconcilable with Robert Half's written certification of no employment records.

Robert Half International, responding to Plaintiff's subpoena, certified on July 22, 2025 that it conducted a thorough search of its records and found no employment records for Defendant for the period January 2023 to the present. (Cornell Aff. ¶21; Ex. S.) This certification, combined with Defendant's own sworn admission that she had not worked at Robert Half for years before June 2023, conclusively establishes that the pay stubs she submitted to Plaintiff were fabricated.

Dominick White failed entirely to appear for his court-ordered Rule 2004 examination despite multiple court orders and proper service of process [ECF Nos. 23, 29, 30, 42]. White—Defendant's co-applicant on the lease, cohabitant, and source of all rental payments—possesses direct knowledge of Defendant's financial condition and the circumstances of the application. His complete and unexplained non-compliance supports the inference that his testimony would be unfavorable to Defendant. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

## E.  Pattern of Serial Default and Concealment

This is not an isolated incident. Defendant has a documented history of default spanning multiple jurisdictions. Defendant's own bankruptcy schedules disclose that 1719 Gates LLC—her prior Queens landlord—is owed $39,350, a debt arising from eviction proceedings (LT-320223-22/QU) that were pending when she applied to Plaintiff. Rather than disclosing this eviction to Plaintiff, she supplied a fabricated reference from "Amanda Moss," purportedly of that very same entity, falsely representing herself as a tenant in good standing. (Cornell Aff. ¶¶3, 6; Exs. A, D.)

Further, prior to the Queens tenancy, landlord Michael K. Reid filed a non-payment proceeding against Defendant in Binghamton City Court in 2020, Case No. LT-126012-20/BI, ultimately recovering possession only through negotiated settlement. (Cornell Aff. ¶23; Exs. U, V.) At her Rule 2004 examination, Defendant denied awareness of this proceeding despite documented personal service. (Ex. Q.) This pattern of serially defaulting tenancies—Binghamton, Queens, and now the Bronx—establishes that Defendant's conduct was not the product of financial hardship but of deliberate, systematic exploitation of landlords.

The coordinated nature of the fraud is further demonstrated by the fabrication of White's pay stubs in addition to Defendant's own. The application package did not contain a single authentic income document: Defendant's Robert Half pay stubs were fabricated in their entirety, and White's Saint Barnabas Hospital pay stubs were altered to inflate his net pay from $2,758.10 and $1,896.14 to a uniform $4,357.34 on both forms. (Cornell Aff. ¶¶4, 5; Exs. B, C.) This was not a single forged document; it was a comprehensive fabrication of an entire application package.

The sophistication of Defendant's scheme is further illuminated by New York Real Property Law § 227-f, which prohibits landlords from inquiring into or considering a prospective tenant's eviction history when evaluating rental applications. Defendant was the direct beneficiary of this statutory protection: Plaintiff was legally prohibited from searching eviction records as part

of his standard due diligence. Defendant exploited this shield as a sword. Knowing that her active

Queens County eviction by 1719 Gates LLC would not appear in any lawful screening inquiry,

she went one step further—fabricating an affirmative landlord reference from "Amanda Moss,"

purportedly an agent of that very same landlord, who falsely represented Defendant as a tenant in

good standing. This was not a passive omission; it was the calculated weaponization of a tenant-

protection statute to facilitate fraud. The "Amanda Moss" fabrication was precisely tailored to fill

the evidentiary gap that § 227-f created, transforming what would have been a disqualifying

tenancy history into a fabricated endorsement. This level of premeditation is powerful evidence of

the specific intent to deceive required under both § 727(a)(4)(A) and § 523(a)(2)(A).

# V.  ARGUMENT

## A.  Legal Standard: Default Judgment Under Fed. R. Civ. P. 55(b)(2)

Federal Rule of Civil Procedure 55(b)(2), incorporated into adversary proceedings by

Federal Rule of Bankruptcy Procedure 7055, authorizes this Court to enter a default judgment

when a party has failed to plead or otherwise defend. Upon the entry of default, the Court must

"accept all [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor,"

*Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009), and determine whether those allegations

"establish [defendant's] liability as a matter of law". Well-pleaded factual allegations in the

complaint are "deemed admitted" by virtue of the default. *Au Bon Pain Corp. v. Artect, Inc.*, 653

F.2d 61, 65 (2d Cir. 1981). Default is not an admission of damages; the Court must make an

independent determination of the amount of damages. *Finkel*, 577 F.3d at 83 n.6.

The burden of proof in non-dischargeability and discharge denial proceedings is a

preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The well-pleaded

factual allegations of the Complaint—deemed admitted by Defendant's default—satisfy that standard as to each of Plaintiff's five Counts, as set forth below.

## B.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) mandates denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." To prevail, a plaintiff must establish by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor acted with fraudulent intent; and (5) the statement was material. *Wiley v. Mattei (In re Mattei)*, Adv. Pro. No. 21-07029-LGB (Bankr. S.D.N.Y. June 8, 2023) (Beckerman, J.), *aff'd*, 23-CV-06093 (PMH) (S.D.N.Y. Apr. 12, 2024). "Omissions as well as affirmative misstatements qualify as false statements for Section 727(a)(4)(A) purposes." *Id.* at 5. Moreover, "[e]vidence of reckless disregard for the truth provides sufficient basis to find fraudulent intent." Each of Defendant's false oaths satisfies all five elements:

### 1.  Eviction Judgment Omission

Defendant answered "No" to Question 11 of the bankruptcy petition regarding whether any creditor had obtained a judgment against her within the past year. This answer was made under penalty of perjury. It was false: two Bronx County judgments of possession were entered against her on January 23–24, 2025, just eighteen days before she filed. She admitted knowledge of both at the 341 Meeting. (Cornell Aff. ¶12; Ex. J.) There is no innocent explanation for this omission: Defendant was a named respondent in both proceedings and had fully litigated them. The omission was material because it bore directly on the automatic stay analysis, the Trustee's obligations, and Defendant's entitlement to relief. *See In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) ("The duty

of disclosure in a bankruptcy proceeding is a continuing one, and a debtor's omissions from schedules constitute false oaths.").

### 2. Financial Account Omissions

Defendant answered "No" to Schedule A/B, Question 17, disclosing no financial accounts. This answer was false as to at least six accounts: Bank of America accounts DDA 4976 and DDA 4989, Zelle, CashApp ($QueenBCashy), AppleCash and PayPal. Each account was active and in use at or near the petition date, as confirmed by self-authenticating business records from Bank of America (Ex. L), Early Warning Services/Zelle (Exs. I, M), Block, Inc. (Ex. H), and PayPal account statements (Ex. N). Defendant admitted possessing these accounts when confronted at the 341 Meeting. (Ex. J.) The omission of multiple active financial accounts is *per se* material to estate administration and asset calculation. The volume and specificity of the concealed accounts— spanning three separate digital payment platforms—demonstrates deliberate, not inadvertent, concealment.

### 3. Income Discrepancy

Defendant declared $7,500 in gross income for 2023 in her Statement of Financial Affairs. She simultaneously submitted to the Chapter 7 Trustee a sworn affidavit stating she earned insufficient income to file a tax return in 2023. Yet she supplied Plaintiff with pay stubs reflecting $28,400 in year-to-date Robert Half earnings as of June 2023. The $20,900 discrepancy is not a rounding error—it is more than twice her declared annual income. A debtor cannot in good faith certify $7,500 in annual income while having represented $28,400 in mid-year earnings from a single employer. Either the pay stubs were fabricated (supporting the § 523(a)(2) claims) or the SOFA income figure was fabricated (establishing the false oath under § 727(a)(4)(A)). The evidence compellingly supports both conclusions simultaneously. This discrepancy is material to

every aspect of case administration, from the means test calculation to creditor evaluation of the petition.

### 4. Fraudulent Intent

Fraudulent intent is established overwhelmingly by the record. The Second Circuit and this Court have held that fraudulent intent may be inferred from the "totality of the circumstances." *In re Mattei*. A systematic pattern of omissions is itself evidence of intent. Here, the pattern is extraordinary: multiple false answers across multiple forms, concealment of accounts on three separate platforms, internally contradictory sworn statements about income and employment, the concealment of ongoing financial support from White—including $1,000 in payments White made directly to Defendant's bankruptcy counsel, with Zelle memos explicitly identifying the payments as being on Defendant's behalf (Exs. I, M)—and, most significantly, Defendant's abrupt walkout from court-ordered examination at the exact moment questioning turned to the fabricated pay stubs.

Courts have recognized that evasive conduct when confronted with evidence of false statements constitutes powerful evidence of consciousness of guilt. *In re Adler*, 395 B.R. 827, 841 (E.D.N.Y. 2008). Defendant's walkout was not accidental; it was calculated and timed to avoid sworn testimony about the central documentary fraud in this case. She disconnected at 2:03 p.m.—precisely 29 minutes into the examination and immediately upon questioning about Robert Half International. As documented in Plaintiff's contemporaneous sworn affidavit filed with this Court [ECF No. 48 in the main case; Ex. R], Plaintiff made immediate and repeated efforts to secure Defendant's return: he contacted her counsel's office and the firm's paralegal, remained on the Zoom call with the court reporter, and kept both their schedules available for the remainder of the afternoon. Defendant never returned, never communicated any explanation, and has never sought

15

to reschedule. This behavior is the hallmark of a debtor who knows the truth and cannot afford to speak it under oath.

## C.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(2)(A)

Section 727(a)(2)(A) requires denial of discharge if a debtor, "with intent to hinder, delay, or defraud a creditor," has "transferred, removed, destroyed, mutilated, or concealed" property "within one year before the date of filing of the petition." The concealment need not be of tangible property; financial accounts and their contents qualify. Intent to defraud may be inferred from conduct and circumstances. *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983).

Defendant concealed multiple financial accounts and the funds therein within one year before her February 11, 2025 petition date. Her Bank of America accounts, Zelle account, CashApp account, PayPal account, and AppleCash account were each active during the one-year lookback period of February 11, 2024 through February 11, 2025. Each was omitted from her bankruptcy schedules despite her actual knowledge of their existence, as confirmed by her 341 Meeting admissions and subpoena responses. The omission of these accounts—and the financial activity passing through them—from sworn bankruptcy disclosures constitutes concealment within the meaning of § 727(a)(2)(A).

The intent element is satisfied by the same totality of circumstances that establishes fraudulent intent under § 727(a)(4)(A): the multi-platform nature of the concealment, spanning multiple digital payment accounts; the volume of concealed transactions (416 total); the stark contrast between Defendant's claimed $7,500 annual income and $27,663.19 in documented digital transactions; White's payments of $1,000 directly to Defendant's bankruptcy counsel—with memos explicitly identifying the payments as being on Defendant's behalf—demonstrating that

the concealment of their financial relationship was coordinated and ongoing, not a one-time

oversight (Exs. I, M); and Defendant's flight from examination when questioned about the very

employment documentation underlying the original fraud. *In re Kaiser*, 722 F.2d at 1582 (intent

to defraud under § 727(a)(2) may be established from the "totality of the debtor's conduct").


### D.  Defendant's Discharge Should Be Denied Under 11 U.S.C. § 727(a)(5)

Section 727(a)(5) bars discharge when a debtor "has failed to explain satisfactorily, before

determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets

to meet the debtor's liabilities." Once a creditor demonstrates that the debtor at an earlier point in

time had assets that are no longer available to creditors, the burden shifts to the debtor to

satisfactorily explain their disposition. *In re Cacioli*, 463 F.3d 229, 238 (2d Cir. 2006).

Plaintiff has established the earlier existence of assets through Defendant's own

documentary submissions: pay stubs reflecting $28,400 in year-to-date income as of June 2023.

These documents were submitted by Defendant herself. They create the predicate showing that

Defendant represented substantial income resources entirely absent from her bankruptcy

schedules. Additionally, Defendant received $11,804.64 from White through digital payment

platforms during the period January 2023 through mid-2025, while simultaneously transferring

$15,858.55 to White over the same period. (Exs. H, I, M, O, P.)

Defendant has never explained: (1) the disposition of the income she represented on the

fabricated pay stubs; (2) what happened to the funds received from White; (3) how she paid $3,300

per month in rent for six months on $7,500 in declared annual income; (4) the source and

disposition of the $15,858.55 she transferred to White; or (5) how she funded legal representation

in this bankruptcy case, given that Zelle records show White—not Defendant—paid $1,000

directly to her bankruptcy counsel in three installments between February and April 2025 (Exs. I, M). When questioned at the 341 Meeting, she provided only evasive responses, and at the Rule 2004 examination, she abandoned the examination entirely. Her subsequent default in this adversary proceeding compounds this failure: by defaulting, Defendant has forfeited her final opportunity to provide the "satisfactory" explanation that § 727(a)(5) demands. A debtor who refuses to explain when questioned under oath, walks out of court-ordered examination, and then defaults when sued cannot claim to have "explained satisfactorily" the disposition of her assets. This silence—at every stage of these proceedings—constitutes grounds for denial of discharge under § 727(a)(5).

### E.  In the Alternative, Plaintiff's Debt Is Non-Dischargeable Under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To prevail, a creditor must demonstrate by a preponderance of the evidence: (1) a material misrepresentation that the debtor knew was false or made with gross recklessness as to its truth; (2) intent to deceive; (3) justifiable reliance; and (4) proximate causation of loss. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

**Element 1 — False Representation.** Defendant submitted a rental application containing multiple material false representations: (i) fabricated Robert Half pay stubs attributing $28,400 in year-to-date income to Defendant; (ii) fabricated pay stubs for co-applicant White inflating his actual Saint Barnabas Hospital net pay of $2,758.10 and $1,896.14 to a uniform $4,357.34—a discrepancy

confirmed by both Saint Barnabas Hospital payroll records and Municipal Credit Union direct deposit records obtained by subpoena (Cornell Aff. ¶¶4, 5; Exs. B, C); and (iii) a fabricated landlord reference from "Amanda Moss," a non-existent person, falsely representing that Defendant was a tenant in good standing at her prior address while she was simultaneously subject to an active eviction proceeding by that very landlord. The "Amanda Moss" reference is actionable under § 523(a)(2)(A) independently of the pay stub fraud: it is not a "statement respecting the debtor's financial condition" but rather a false assertion of fact about Defendant's rental history and character as a tenant. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716–17 (2018) (distinguishing statements about "financial condition" from other misrepresentations).

**Element 2 — Intent to Deceive.** The fabrication of a landlord reference from a non-existent person—using a functional telephone number that the fictitious reference answers—demonstrates specific intent to deceive. Shaye Falkowitz of CW Realty Group, the management company for 1719 Gates LLC, confirmed that no person named Amanda Moss has ever been an agent of the LLC or an employee of the management company. (Cornell Aff. ¶6; Ex. D.) Defendant did not merely omit her Queens eviction from the application—she affirmatively fabricated an endorsement from the very landlord that was actively evicting her.

**Element 3 — Justifiable Reliance.** The reliance standard under § 523(a)(2)(A) is "justifiable," not "reasonable"—a creditor "may justifiably rely on a representation even though its falsity could have been ascertained upon investigation." *Field v. Mans*, 516 U.S. 59, 74 (1995). Plaintiff called telephone number (929) 353-0387—the number listed on the application for "Amanda Moss"—on June 19, 2023, and spoke for three minutes and fifty-nine seconds with a person who answered

affirmatively to all questions about Defendant's tenancy. Plaintiff's call log independently corroborates this contact. (Cornell Aff. ¶7; Ex. E.) The falsity of this reference was not "apparent from a cursory glance"—it required an investigation from 1719 Gates LLC management to uncover. Plaintiff's reliance was entirely justifiable. Id. at 74–75.

**Element 4 — Proximate Causation.** Defendant's fraud was the direct and proximate cause of all of Plaintiff's losses. Had the true state of affairs been known—that Defendant had no verified income, had defaulted on her rental obligations to her prior landlord, and was supplying fabricated documentation—Plaintiff would not have executed the lease. Every dollar of unpaid rent, every dollar of eviction cost, and every dollar of property damage flows directly from Plaintiff's execution of a lease he was fraudulently induced to enter. Section 523(a)(2)(A) excepts from discharge "any debt" arising from the fraud, including all consequential damages. *Cohen v. de la Cruz*, 523 U.S. 213, 218–19 (1998). Plaintiff's total damages of $81,267.79 are therefore non-dischargeable in their entirety.

The "obtained by fraud" standard does not require that Defendant personally fabricated each document. Under *Bartenwerfer v. Buckley*, 598 U.S. 21, 27–29 (2023), § 523(a)(2)(A) focuses on "how the money was obtained, not who committed the fraud." Even if any portion of the fraudulent scheme was executed by White rather than Defendant personally, the lease—and thus the debt—was obtained by fraud, rendering it non-dischargeable as to Defendant.

### F.  In the Alternative, Plaintiff's Debt Is Non-Dischargeable Under 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debts obtained by "use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." To the extent this Court determines that the fabricated Robert Half pay stubs and W-2 constitute "statements respecting financial condition" within the meaning of *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018), each element of § 523(a)(2)(B) is satisfied:

**(i) Materially False:** Robert Half International certified that it found no employment records for Defendant from January 2023 to the present. Defendant's own sworn testimony confirms she had not worked at Robert Half since approximately 2020 or 2021. The documents showing $28,400 in current year-to-date earnings were materially false in the most fundamental sense—they attributed employment and income to an employer who affirmatively denies any such relationship.

**(ii) Respecting Financial Condition:** Pay stubs reflecting employment, year-to-date earnings, tax withholding, and direct deposit information directly represent a debtor's financial condition. *Appling*, 584 U.S. at 716–17.

**(iii) Reasonable Reliance:** Plaintiff verified the 4.6x income-to-rent ratio generated by the application screening platform and reviewed the submitted pay stubs, which contained ADP payroll formatting, detailed tax calculations, and routing information consistent with genuine documentation. A landlord verifying income through standardized payroll documents is engaging in the industry-standard practice of income verification. This reliance was objectively reasonable. *In re Bogdanovich*, 292 F.3d 104, 111 (2d Cir. 2002).

**(iv) Intent to Deceive:** The fabrication of documents that misappropriated the EIN of St. Barnabas Hospital and replicated the formatting of ADP payroll software evidences

premeditation and specific intent to deceive. Defendant's walkout from examination when confronted with evidence of this fabrication further establishes the requisite intent.

## G.  The Clerk's Entry of Default Should Not Be Vacated

Defendant's letter [ECF No. 7] requests that the Court set aside the Clerk's Entry of Default. This request should be denied. Federal Rule of Civil Procedure 55(c) permits a court to set aside an entry of default only upon a showing of "good cause." When evaluating whether good cause exists, courts in the Second Circuit weigh three factors: (1) whether the default was willful; (2) whether the defendant has a meritorious defense; and (3) the prejudice to the plaintiff. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95–96 (2d Cir. 1993). All three factors weigh decisively against vacatur.

### 1.  The Default Was Willful

A default is willful when it results from a deliberate or intentional failure to respond, rather than from accident or inadvertence. *Enron Oil*, 10 F.3d at 96. Defendant and her counsel of record in the main bankruptcy case Jeb Singer, Esq., were properly served with the Summons and Complaint in accordance with Fed. R. Bankr. P. 7004 [ECF No. 3]. Defendant claims she was not informed by her counsel. But a party's failure to ensure adequate legal representation during litigation is within her own control. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (failure to monitor counsel's actions weighs against excusable neglect). Moreover, this Court should assess Defendant's claim of ignorance in context. Defendant was keenly aware of Plaintiff's adversarial posture throughout the main case: she was examined at the 341 Meeting by Plaintiff, she participated in motion practice concerning Rule 2004 examinations, she appeared (briefly) for her court-ordered examination in September 2025, and she was subject

to multiple court orders directing her compliance. The claim that she was unaware of the December 29, 2025 adversary complaint—filed after all of that history—strains credibility. Moreover, service was properly effectuated under Fed. R. Bankr. P. 7004(b)(9) and (g), which authorize service upon the debtor's attorney of record. Any failure of communication between Defendant and her counsel is a deficiency in their attorney-client relationship, not a defect in service—and it is not grounds for setting aside a properly entered default. The failure to answer mirrors Defendant's established pattern of strategic non-engagement: walking out of court-ordered examination—as documented in Plaintiff's sworn affidavit [ECF No. 48 in the main case; Ex. R]—failing to produce court-ordered documents, and her co-applicant's complete refusal to comply with any court order in this case. The coordination underlying this pattern is further illuminated by Zelle records showing that White—who has refused to appear for any court-ordered examination—paid $1,000 directly to Defendant's bankruptcy counsel between February and April 2025, with memos explicitly identifying the payments as being on Defendant's behalf. (Exs. I, M.) The individual funding Defendant's legal representation is the same individual who has systematically evaded every obligation imposed by this Court. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (willful default where no reasonable excuse offered).

### 2. Defendant Has No Meritorious Defense

To obtain vacatur, a defendant must present "a hint of a suggestion which, proven at trial, would constitute a complete defense." *Enron Oil*, 10 F.3d at 98. ECF No. 7 presents none. Defendant's letter contains no response whatsoever to the five Counts of the Complaint. It does not deny fabricating the pay stubs. It does not explain why Robert Half has no employment records for her. It does not address the concealed financial accounts. It offers no explanation for the $20,900 income discrepancy. It does not address the fabricated landlord reference.

The documentary record is not susceptible to meritorious defense. Robert Half's certification of no employment records, combined with Defendant's own sworn testimony that she had not worked there since "around 2020" or "around 2021," conclusively establishes the fabrication of the June 2023 pay stubs. The bank records confirming the existence of accounts she denied possessing are self-authenticating business records. There is no good-faith defense to any of this evidence.

### 3.  Vacatur Would Materially Prejudice Plaintiff

Plaintiff has expended substantial resources in reliance on the valid procedural posture of this case. He retained ABC Legal to effect personal service on multiple parties, engaged court reporter Joshua B. Edwards for the Rule 2004 examination, and served third-party subpoenas on financial institutions and employers. Financial institution records have finite retention periods; vacating the default and reopening discovery would risk the loss of evidence already obtained at significant cost. Furthermore, requiring Plaintiff to restart litigation after Defendant's deliberate walkout from examination would reward exactly the kind of strategic non-engagement that Rule 37 and the default judgment mechanism are designed to deter. The March 12, 2026 hearing is already calendared; vacatur would impose additional delay and cost on a pro se Plaintiff who has already devoted extraordinary resources to pursuing this matter.

## H.  Rule 55(b)(2) Notice Is Satisfied

Federal Rule of Civil Procedure 55(b)(2), incorporated by Fed. R. Bankr. P. 7055, requires that if a party "has appeared personally or by a representative," the party must be served with written notice of the application for default judgment at least seven days before the hearing. Even assuming *arguendo* that Defendant's letter [ECF No. 7] constitutes an "appearance" within the

meaning of this rule—which Plaintiff does not concede—the seven-day notice requirement is independently satisfied: this Motion will be filed and served upon Defendant and her counsel of record on or before February 26, 2026, which is fourteen (14) days before the March 12, 2026 hearing.

Plaintiff does not concede that ECF No. 7 constitutes an "appearance" for Rule 55(b)(2) purposes. A party has "appeared" in this context only when it has "indicate[d] a clear purpose to defend the suit." *Enron Oil*, 10 F.3d at 96. Defendant's letter implies a desire to have the default set aside but presents no substantive defense to any claim—it does not constitute "a clear purpose to defend" within the meaning of *Enron Oil*. Nevertheless, the notice question is moot because Defendant is receiving fourteen days' advance notice regardless.

## VI.  DAMAGES

Plaintiff respectfully requests that this Court determine damages in the amount of $81,267.79, representing the full net balance shown on Plaintiff's tenant ledger as of February 20, 2026. (Cornell Aff. ¶9; Ex. G.) This figure is derived from independently verifiable components documented in the Cornell Affidavit and the Exhibits thereto:

**Pre-Petition Balance ($62,644.88 as of February 11, 2025):** This figure is confirmed by the petition-date snapshot ledger (Ex. T) and comprises: (a) $19,800.00 in unpaid rent for the lease period, January through June 2024, at $3,300/month; (b) $39,600.00 in holdover rent for the period July 2024 through February 2025, at $4,950/month (representing the holdover rate stipulated in the lease); and (c) $3,244.88 in late fees, process server fees, court filing fees, and attorney fees incurred in the Bronx County housing court proceedings.

**Post-Petition Losses ($18,622.91):** These losses were proximately caused by Defendant's fraud and her continued unauthorized occupation of the Premises following the petition date. They comprise: (a) $4,311.09 in prorated holdover rent for March 1–27, 2025, at $159.67 per day through the date of the marshal's eviction; (b) $50.00 in post-petition late fees; (c) $2,314.86 in post-petition legal fees, City Marshal fees, and eviction costs; and (d) $11,946.96 in documented property damage and post-vacancy restoration costs discovered upon regaining possession on March 27, 2025. (Cornell Aff. ¶24; Ex. G.)

**Total Payments Received ($23,150.00):** Defendant and White made payments for the security deposit and six months of rent (July through December 2023). These payments are reflected as credits in the tenant ledger and are already netted in the total balance of $81,267.79; no double-counting has occurred. (Cornell Aff. ¶9; Ex. G.)

For purposes of the § 523(a)(2) non-dischargeability claim, the primary damages figure is the pre-petition balance of $62,644.88, representing the debt directly obtained through Defendant's fraudulent rental application. Post-petition losses of $18,622.91 are additionally recoverable under § 523(a)(2) to the extent they flowed proximately from the original fraud. *Cohen v. de la Cruz*, 523 U.S. 213, 218–19 (1998). Plaintiff further requests determination of pre-judgment interest from the dates each obligation accrued, and post-judgment interest at the federal rate applicable under 28 U.S.C. § 1961.

## VII.  CONCLUSION

The record in this case is clear and compelling. Defendant fabricated employment documents to obtain a lease she could not afford, paid no rent for over fourteen months, concealed her financial accounts from the bankruptcy court and its Trustee, made multiple false oaths under penalty of perjury, and fled court-ordered examination at the precise moment she was confronted

with the central evidence of her fraud. The Clerk has entered her default. She has presented no meritorious defense.

The documented pattern across three jurisdictions—Binghamton, Queens, and the Bronx— demonstrates that Defendant is a "professional tenant" who strategically signs leases she cannot afford and has no intention of honoring, fabricates the documentation necessary to pass screening, exploits tenant-protection statutes to conceal her adverse history, and now seeks the shelter of the Bankruptcy Code when the consequences of her fraud catch up with her. This is not a debtor deserving of a fresh start. This is a debtor who has demonstrated a pattern of calculated dishonesty that is fundamentally incompatible with the fresh start the Bankruptcy Code reserves for honest debtors. The Bankruptcy Code's discharge provisions exist to give honest but unfortunate debtors a fresh start—not to reward fraud. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (the "fresh start" policy is reserved for the "honest but unfortunate debtor").

For all of the foregoing reasons, Plaintiff Jonathan Cornell respectfully requests that this Court enter an Order:

(a) Granting Plaintiff's Motion for Default Judgment in its entirety;

(b) Denying Defendant's discharge in its entirety pursuant to 11 U.S.C. §§ 727(a)(4)(A), 727(a)(2)(A), and/or 727(a)(5);

(c) In the alternative, determining that Plaintiff's debt in the amount of $81,267.79 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(2)(B), and fixing said amount as the quantum of Plaintiff's non-dischargeable claim for purposes of all subsequent proceedings, including any action to reduce said debt to judgment;

(d) Declining to vacate the Clerk's Entry of Default [ECF No. 5];

(e) Awarding Plaintiff pre-judgment interest from the date each obligation arose and post-judgment interest at the rate prescribed by 28 U.S.C. § 1961;

(f) Awarding Plaintiff costs and expenses of this adversary proceeding pursuant to Bankruptcy Rule 7054 and Federal Rule of Civil Procedure 54(d);

(g) Considering, in connection with the foregoing determinations, the complete failure of Dominick Franklin White to comply with this Court's orders directing his Rule 2004 examination as supporting adverse inferences that his testimony would have established facts unfavorable to Defendant regarding her income, financial accounts, and the circumstances of the fraudulent lease application, pursuant to Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); and

(h) Granting such other and further relief as the Court deems just and proper.

Dated:  February 25, 2026
        Manhasset, New York

Respectfully submitted,

_____

Jonathan Cornell, Pro Se
120 Bourndale Road North
Manhasset, New York 11030
Tel: (646) 374-8267
Email: cornell.jonathan@gmail.com